et al. Oral argument to be 15 minutes shared by plaintiffs and intervener, and 15 minutes for the defendant, Mr. Meredith for the appellate. Good morning. Good morning sir. May it please the court. Your honors, my name is Chad Meredith and I represent Secretary Adam Meier and Governor Matt Bevin in this appeal. Judge Clay, I'd like to reserve four minutes for rebuttal please. Very well. Your honors, the appellees are asking to be excused from an otherwise generally applicable requirement simply because they provide abortions. Specifically, they want to be excused from a law requiring them to have transfer agreements, which are important safety measures that even the National Abortion Federation recommends and which this court found to be constitutional in Women's Medical Professional Corporation v. Baird. Even though this court has already upheld the constitutionality of laws requiring transfer agreements in Baird, the district court declared Kentucky's law unconstitutional and permanently enjoined its enforcement. There are a number of reasons why the district court's judgment should be reversed, but I plan to focus on two here today, your honors. First, the district court incorrectly applied the undue burden standard. And second, the district court failed to even attempt to apply the appropriate test for facial invalidity. And your honors, if there's time at the end, I'd like to briefly address the fact that Planned Parenthood has no third party standing here. So just to start off, the old regulations which basically just parroted the statute, those have been repealed and replaced by some new regulations, correct? So those old regulations are no longer in effect. That's correct, your honor. So that means that there's the possibility of getting transfer agreements or the possibility of a good faith attempt to get transfer agreements plus some alternative health measures, is that right? That's correct. Is there any other kind of provision in Kentucky law that requires a business to operate under a 90 day license extension like this one? Well, not that I'm aware of, your honor, but... So it doesn't apply, like there aren't sort of these 90 day license extension options for other kinds of medical facilities or restaurants or... Well, there are provisional licensing options which allows you to become provisionally licensed while you're attempting to get into full compliance for licensure. But what's important to point out is this new regulation actually gives more lenient treatment to abortion facilities than to other similarly situated facilities where outpatient surgical procedures are performed. Under 900KAR5020, which we cite in our briefs, ambulatory surgical centers are also required to have transfer agreements. And if they can't get transfer agreements, they don't get to take advantage of this 90 day opportunity. Only abortion facilities have that leniency in Kentucky. So they're already treated more leniently than similarly situated facilities. But they won't even... So every surgical center in the state of any type has to have a transfer agreement? That's correct, your honor. Go ahead, sorry. Well, your honor, there are four places in Kentucky where you can have an abortion. Hospitals, ambulatory surgical centers, abortion facilities, and doctor's offices. This regulation only affects one out of those four. Ambulatory surgical centers also have to have transfer agreements. Are there requirements that would apply to... I think you're mentioning one, the 90 day, but are there other requirements that apply only to... that don't apply to centers where abortions perform but do apply to other surgical centers? Well, ambulatory surgical centers in Kentucky have a much higher burden for licensure because they have to go through the Certificate of Need process as well. Kentucky is one of the minority of states that still has a Certificate of Need process. And the Certificate of Need process is a rigorous process that abortion facilities don't have to go through. They just have to meet the requirements for licensure. Ambulatory surgical centers must go through Certificate of Need process and meet the requirements for licensure. One of the problems, in Whole Woman's Health, the Supreme Court faulted Texas because they held the abortion facilities to the same standard basically as all surgical centers required them to register in the exact same way. That's not the case in Kentucky then. There are lower thresholds that apply to centers where abortions are performed. That's exactly correct, Your Honor. That's exactly correct. And that's... and all this goes into the District Court's mistakes in applying the undue burden standard here. The undue burden... Why are you spending time talking about the transfer agreements? Plaintiffs have produced evidence that they cannot obtain transfer agreements in spite of diligent efforts to do so. And the District Court is so found and there doesn't appear to be any contrary evidence in the record on that. So why are you spending time on that? Well, Your Honor, you're correct. The EMW and Planned Parenthood have not been able to obtain transfer agreements in Kentucky. And, you know, if the Commonwealth just wanted to shut down abortion clinics, we would say, well, too bad. You didn't get your transfer agreements. You're done. But this is not about shutting down abortion clinics. This is about women's safety and health. And as a result of that, the Commonwealth said, look, as long as you are continuing to make good faith efforts to get transfer agreements and you can demonstrate to us every 90 days that you have sufficient alternative safety measures... I ask this about women's health when all the seems like a superfluous requirement, more so than something to address women's health if we rely upon the data and the evidence. So what are you talking about? Well, Your Honor, I would disagree with that premise for two reasons. First, it might be the case that there are not deadly complications in every abortion or even a majority of abortions, but I wouldn't necessarily describe them as safe. There are abortion complications that are very serious. There was Dr. Richard Hamilton... There was evidence and the judge made findings. So I guess the operative question is how was the evidence on this point defective and what constitutes or makes the findings improper? I mean, you could talk about the issue that we want health, we want safety and appropriate treatment for women, which goes without saying, but to talk about that without addressing the evidence and seemingly evidence indicating that there is no lack of safety in the clinics run by the plaintiffs, how does this become a pertinent issue for our appeal? Well, Your Honor, I'm happy to explain that. Before I do that, let me digress for a second to make one point that wasn't really articulated in the briefs and that is that... Does it relate? Yes, sir. It relates to your question. It's kind of a prologue to answering your question here. This court has held twice in published opinions that in abortion cases dealing with the undue burden standard, you don't just review questions of fact for clear error. This court treats them like legal issues. This court held in Women's Medical Professional Court v. Voinovich and Women's Medical Professional Court v. Taft that while we normally review questions of fact for clear error, an appellate court is to conduct an independent review of the record when constitutional facts are at stake. So this court is to take an independent review of the record. But even so, the evidence is abundant here that there are great benefits from transfer agreements. Benefits were established by this court in Baird. Baird held that transfer agreements serve a valid purpose. They ensure providers have a license to operate and meet certain standards. Wait a minute. That's not pertinent because the Baird case was decided before the Whole Women's Health case that said that you have to balance the benefits and the burdens and the Baird case didn't do that for no other reason than because it came before Whole Women's Health. Well, Judge Clay, you're exactly correct that Baird was before the Hellerstedt case, but Baird acknowledged the benefits of transfer agreements. Baird also held that transfer agreement requirements ensure that surgical centers can transfer patients in the event of medical complications, emergency situations and for other needs as they arise. So in other words, your argument is Baird, while it didn't do the burden benefit balancing required by Whole Women's Health, it still found that there are benefits even though it didn't balance them against burdens and that that binds us? Well, Your Honor. The benefit side of the equation? Baird established the benefits of transfer agreements and I think those findings are in there. There's no holding to that effect in Baird. It touched upon and discussed, but it didn't promulgate a holding. Well, those benefits were clearly discussed in Baird, but even setting that aside, the record is replete with evidence of the benefits here. Dr. Richard Hamilton is the only emergency room physician who testified in this case. He's a board certified emergency room physician. He's chair of emergency medicine at Drexel University. He's treated thousands upon thousands of transfer patients in his emergency room and he testified unequivocally that transfer agreements optimize a chance for a good outcome in emergencies based on his professional experience. Aren't there a number of other states that also have similar transfer requirements? Yes, sir, Your Honor. California is one of those, I think. I think that's right. I'm not 100% certain, but I think that's right. I'd like to get back to the waiver provision. If the waiver provision could operate here, so we could, even if we said, well, they can't get a transfer agreement, I think the district court found that, they can make good faith efforts to get a transfer agreement or comply with your satisfaction that the abortion facility can provide the same level of patient care via alternate health services. Do we have any evidence in the record about what you would accept as evidence of alternate safety regulations? Are we able to decide that? Well, Your Honor, that's a good question because there's no evidence in the record precisely because nobody tried and that's the causation issue. The Fifth Circuit pointed that out in June Medical. The Hawley case from the Eighth Circuit also dealt with that. No one has even made any attempt here. Didn't they argue they can't because they've been enjoined? Well, Planned Parenthood came, they've not been enjoined from making an attempt. They could have tried. Regulations aren't in operation, right? The regulations are temporarily on hold. They were subject to a temporary injunction and to your agreement that they wouldn't be enforced. Right now, they couldn't apply. Is that correct? Well, that's not entirely correct, Your Honor. Planned Parenthood came into this case months after the TRO was entered and the preliminary injunction was entered. But what about EMW? The injunction was against the Commonwealth enforcing the statute and regulation against them. Nothing would have prevented EMW from trying to say, and there's no evidence in the record. We asked Dr. Marshall from EMW at trial, what would prevent you from complying with the 90-day extensions of time? Keep in mind, in his deposition, he said, well, that wouldn't be a burden. But at trial, magically, it all of a sudden did become a burden. There's no evidence in the record that would be a burden on anyone. Your Honor, I see my time is up. May I have the microphone? There is evidence in the record. There's testimony that the plaintiffs couldn't satisfy the 90-day burden. There's abundant testimony. When you say there's nothing in the record, what are you talking about? Because there's all that testimony addressing that precise issue. Well, what I'm talking about is we specifically asked Planned Parenthood's representative at trial and if they could comply, what would prevent them from complying. And they said, well, I don't know. Maybe we could comply. Maybe we'll try. That is a far cry from saying there's no way we can do that. Dr. Marshall said that he wouldn't be able to do it because you just can't run a business that way. But that defies all logic. There's no reason to believe that a decades-old business is going to close its doors because it has to rely on 90-day extensions of time. I think you testified that you couldn't get staff if there were only 90-day extensions, there would be too much difficulty in obtaining the necessary staff and funding to keep the place open. I wonder how that could possibly be if we don't know how hard it is to get the extensions. In other words, if you lived in a universe in which the extensions were granted as a matter of course, then obviously people would not, would work there because they're just there. What I don't know is, I assume they're not going to be granted as a matter of course. How hard is it going to be to get them? And maybe the answer is there's no evidence in this record that would tell us that. So we can't decide the causation issue? I think that's right, Judge Larson. There's no evidence. And this goes hand-in-hand with the Hawley case from the 8th Circuit. The 8th Circuit said, look, this really isn't justiciable because we just don't know. No one's put any evidence in the record on this. And this was not our burden to prove causation. It was EMW's and Planned Parenthood's, and they've not proven causation. Keep in mind that Dr. Marshall said, directly contradicted himself at trial. His deposition testimony was that it wouldn't be that big a burden. At trial, magically, it became a burden in his eyes. So we just, I think maybe- The Supreme Court found him credible. The question is whether his testimony, while credible, is sufficient to sustain the causation burden. I don't think it is, Your Honor, because it's all speculative. He's speculating about what he would have, or what third parties would do, his employees would do in the future. And we have no idea what would happen with Planned Parenthood. Their only testimony is, well, maybe we can do it. That's definitely not testimony that establishes causation. And Your Honors, in Hawley, the 8th Circuit essentially said, maybe it would be better if we just let the parties go through this course and see if it's a problem, and then they can come back to court. Can I ask you about- Go ahead. One of the issues in this case is the fact that this could be the last, or maybe this is the last clinic in the state, and if it closes, no woman in the state has access to a clinic, at least within the state. Now, my understanding is there was a clinic in Lexington, and that was open for some time. And I think there's testimony that there is a hospital in Lexington that would be willing to enter into a transfer agreement, but that's outside the distance under the current regulation. Can you just help me understand what happened in Lexington? It's a little confusing to me from the record. What happened with that facility that was there until 2016, I think? That's correct, Judge. What happened with the Lexington facility, it was owned by, it was an EMW sister facility, it was EMW Lexington, and they were operating as an abortion facility without a license. And the Commonwealth of Kentucky filed a lawsuit seeking injunctive relief against further operation of that clinic until it became licensed. And the Kentucky Court of Appeals and the Kentucky Supreme Court unanimously ruled that that clinic had to be shut down until it was licensed. And keep in mind, an inspection showed that clinic was operating with outdated medications, it had unsanitary conditions. And so when that clinic was shut down, EMW decided, well, we're just not going to go through the licensure process, we're just going to shut it down. Did that clinic have a transfer agreement with the hospital? They did. And they just, and the clinic never, I'll ask your friends on the other side too, but the clinic just never pursued any kind of license ultimately? They initially started the licensure process and they just decided to terminate the process and shut it down. It's EMW Clinic, and the one in Louisville is also an EMW Clinic, so run by the same ... Correct. They have the same ownership and physicians. And Planned Parenthood also has a transfer agreement in Lexington. They've never filed an application to be licensed as an abortion facility in Lexington, but they have a transfer agreement there. And keep in mind also, there are, as I said earlier, there are four places in Kentucky you can get an abortion. So even if this technically closes the last clinic, that, you can still get them in hospitals, in ambulatory surgical centers, in doctor's offices, and there's, and we asked Dr. Marshall at trial ... Those don't exist, right, that are performing abortions? Well, they don't exist right now, but there's no reason, we asked Dr. Marshall at trial, why can't you just move your practice and start doing abortions at ambulatory surgical centers? And his only answer was, well, I guess it would depend on the rules of each surgical center. So there's no ... But those surgical places, hospitals and such, where you can get abortions, that's like .07 of a percent. All the other abortions, 98, 99% are controlled or provided by these plaintiffs, is that right? Well, that's correct, Your Honor, but I think that's more a function of the fact that they have essentially cornered the market on abortions in Kentucky. They're the only place where abortions have been performed, and if they went away, that just means they're not being performed in this facility. I mean, I don't know. I mean, the undue burden test seems to ... I don't know. The undue burden test seems to say, what's the availability on the ground at this time? I mean, I'm ... That's a great point, Judge Larson. I don't know. You're exactly right. The undue burden test measures the practical impact on women, and the practical impact here is essentially none, because of the unique geography of Kentucky. And even if this shuts down the last clinic in Kentucky, most women in Kentucky are closer to a clinic in another state than to the EMW clinic in Louisville. It defies logic and reason. You don't get the money to go to another state for an abortion to say nothing of the inconvenience. You talk about, why is that not an undue burden? Well, for several reasons, Judge Clay. First, the testimony in the record is that abortions are $300 less expensive in Indiana than in Kentucky, and it certainly doesn't cost ... to have overnight lodging and miss work, miss more time from work and all that. Well, there's no evidence in the record to show that those expenses would be more than $300. And plus, you know, places, take for instance a place close to Bowling Green, Kentucky, close to the Tennessee border. Those individuals are not going to be going to Louisville anyway for treatment. That's over, you know, two hours where they can go 40 minutes down the road to Nashville. Most people in ... How does that address the situation of a woman who lives on the other side of the state who would need to go way over there to get to another state? Well, I think the point is, Judge Clay, this does not affect most women in Kentucky. There's only one clinic, and most ... given the unique geographical situation of Kentucky, there's no point in Kentucky that is more than 150 miles from an abortion clinic in another state. And this court held in Baird that it is not an undue burden to have to travel from Dayton, Ohio, to Cleveland, Ohio, a distance of 213 miles. So if it's not an undue burden to travel 213 miles, there's no way that it can be an undue burden to travel 150 miles or less to an abortion clinic. It just defies ... the undue burden test is about the practical impact. Wait. I'm sorry. You just said there's no place in Kentucky that is less than 150 miles from ... I'm sorry. More than 150. More than 150 miles from an abortion facility in another state? Correct. Correct. Every single point in Kentucky is no more than 150 miles from an abortion clinic in another state. Almost every single point in Kentucky is within 125 miles. There are just a couple slivers that are outside 125 miles. Would you like to take some time from your rebuttal time to continue? No, Your Honor. May I have just a few seconds to close here before I ... As long as you're wrapping up, right? Yes, sir. I will. Your Honor, the undue burden test is pointed toward practical impact on women. There is no practical impact here, and there are three important overarching questions that my friends on the Appalachian side ... You're going a little beyond wrapping up. You can continue, but you have to take some time from your rebuttal time to do that. Could I have 30 seconds from my rebuttal time, Your Honor? Excuse me? Could I have 30 seconds from my rebuttal time? Sure. Thank you, sir. Your Honor, there are three questions here that I think are very important that the Appalachians have never addressed in this case. First, the National Abortion Federation actually recommends transfer agreements. Why would the National Abortion Federation recommend transfer agreements if they don't benefit patients? Second, why is it not an undue burden to travel 213 miles from Dayton, Ohio to Cleveland, Ohio, but somehow it's magically an undue burden to travel a much shorter distance if you just have to cross a state line? And third, if the Commonwealth of Kentucky cannot require a safety measure that even the National Abortion Federation recommends, then what safety measures can it require of abortion facilities? Your Honor, this is not an undue burden. The Commonwealth of Kentucky has every right to regulate abortion facilities to protect the health and safety of women, and that's what it's doing here. We ask that the district court be reversed. Thank you. Thank you. You're splitting your... Good morning, counsel. Good morning. You're splitting your 15 minutes. How many minutes are you taking? Seven and a half, Your Honor. All right. May it please the Court. Bridget Amiri for Plaintiffs Appellees, EMW Women's Surgical Center, and Dr. Ernest Marshall. Defendants' arguments seem to presume that this case comes to this court on a blank slate. That's simply not the case. This court is bound by the factual findings of the district court that are not clearly erroneous. They must give deference to them. And, of course, it's bound by Holmes Health v. Hellerstedt, which directly controls this case. Weren't the regulations there far more challenging for clinics to meet in Texas than this one is in Kentucky? In other words, there was a... They elevated clinics in Texas to have to comply with the standards for all surgical centers. And my understanding is that it's not the case for abortion clinics in Kentucky. There were two restrictions, Your Honor, issued at Holmes Health. First is the admitting privileges requirement, and the second is the ambulatory surgical center requirement. Both of them were struck down. And with respect to the admitting privileges requirement, there were a number of different healthcare providers that were not required to have admitting privileges to a local hospital, but abortion providers were. And this singling out of abortion providers is exactly what's happening in this case. It is simply wrong to say that different healthcare providers must have transfer agreements that are similar to abortion providers. Ambulatory surgical centers that were licensed prior to 2012 do not have to have transfer and transport agreements. Doctors' offices that provide services that are as safe or less safe than abortion... Currently, they all do. No, Your Honor. They're grandfathered in. The ambulatory... But anyone that's opening now... Before 2012, they're grandfathered in. And the regulation you're challenging was enacted after 2012 also, correct? The regulation was promulgated in the context of discovery in this case. And no other facility is subject to that emergency regulation that provides much more stringent requirements for abortion providers to have transfer agreements. It dictates... I think a host of states have similar transfer requirements. Are those all invalid too? Well, Your Honor, the evidence in this case shows that a transfer agreement does not optimize patient safety. It does not enhance patient safety in any way. Whether a law in a different state is constitutional or not depends upon the certain facts in terms of the benefits and burdens in that particular state. How would they be different? I mean, the basic facts about how a transfer agreement works. It just seems like it's... Ubiquitous might be too strong, but it's a pretty common regulation across states, across the country. Your Honor, it's actually moving... I'm just not sure. Are they all invalid? Because this fact is going to be roughly the same in terms of health issues and the appropriateness of somewhere to be admitted. So I'm just wondering, are they all invalid? Is that your argument? Your Honor, they may be invalid in those different challenges. There's certainly an industry standard of moving away from written transfer agreements, even if they had been on the books for many years ago. Just recently, the Federal Centers for Medicare and Medicaid considered a regulation that would repeal written transfer agreements and admitting privileges for ambulatory surgical centers finding, quote, there's no evidence of negative patient outcomes due to a lack of such transfer agreements and admitting privileges. Your Honor, isn't there a pro-abortion or pro-choice organization that actually suggests that transfer agreements are a pro-choice? Your Honor, that's actually not correct either. The National Abortion Federation has a recommendation that abortion clinics consider entering into them. And in fact, it's not part of their requirements for abortion facilities to be considered for NAF membership. And in any event, even if there's some sort of hypothetical or scant burden or benefit to having transfer agreements, it cannot weigh the burden here. Homeless Health says you must take the benefits and weigh them against the burden. And the burden here is so great.  How much of this turns on the fact that this is the last clinic in the state? If there were five other clinics in the state, would you be making the exact same argument? Well, it depends on whether all of those clinics would be forced to close as well. And so here, we have the total elimination of abortion. We don't know that's true. Because in their particular locality, there might be providers who would be willing to enter into transfer agreements, right? All of this is contingent upon the actions of private third parties, right? Your Honor, two responses. Correct, you look at the record at the time it exists. Homeless Health says you take the clinics as you find them at the time of the record. And at the time of the record in this case, there are one abortion clinic providing and one abortion clinic that had been providing, both of which would be forced to shut down. I understand that. Judge Radler's question was a hypothetical question. What if there were five different clinics in the state? I understand that there aren't. But if there were, it would depend on their circumstances in their location, whether they could get transfer agreements there. You would measure the benefits and the burdens in that circumstance. And we also have pled, but the court has not reached below, the unlawful delegation claim, giving hospitals the ability- Right, but we can't address that. No, but Your Honor, just to the extent that you had mentioned the third parties as well. I have a question. We keep talking about whether or not you can get a transfer agreement or whether there are benefits to transfer agreements, but there's this exception. You don't have to be able to operate. You don't have to be able to have a transfer agreement. All you have to be able to do is make good faith efforts to get one and show that you can provide the same level of patient care via alternate safety measures. Your Honor? Do you think you can't meet that? Yes, Your Honor, the defendants have said we can't. So the inspector general who testified at trial said that he could not guarantee that EMW would be granted one 90-day extension. And certainly he said that EMW would not be granted indefinite extensions. He said it can't guarantee that you would, but did he say that you won't? He said that we certainly would not be able to rely on it indefinitely. Do we know what would be required? I'm still puzzled. I don't know what the alternative health regulations are. So you say we have these awesome protocols, we have these great protocols, therefore transfer agreements aren't necessary. What if the state agreed with you? Do we have any evidence that they don't agree with you? What if they said, you're right, your protocols are good enough? Well, Your Honor, if they had agreed with us, they would have said so in their briefs, and the inspector general would have testified at trial that we met that good faith effort. But you haven't applied for a waiver. No, Your Honor, but they did have the protocols in evidence. They were very familiar with them. They also conceded that not a single woman has been treated improperly because of the lack of a transport or transfer agreement. So here we're talking about the lack of any sort of health benefits of the statute, and so therefore the regulation must fall as well. And in any event, the 90-day extension can be revoked at any time by the inspector general, and that emergency regulation can be amended. At the whim of the inspector general. Yes, Your Honor, that's exactly what the district court found. Those are the precise words that he used is that EMW would be forced to remain open at the whim of the inspector general. He can't mean whim. I mean, if he means whim, then he would have had to have a finding that the state of Kentucky operates in some arbitrary and capricious manner. If they just wave a wand today, you get one today, you don't. There's no finding like that. Your Honor, I think it's certainly up to the discretion of the inspector general. Subject to ordinary rules for abuse of discretion and due process, right? Well, Your Honor, certainly within the text of the regulation, it gives extraordinary discretion. But the other point I'd also like to make is that this isn't an example of the waivers in Baird or in Hawley where those were flat-out waivers of the provision. There is no other circumstance where any abortion provider has been able to continue operation in 90-day increments. And we wouldn't say this is acceptable for any other business. Imagine. What about a restaurant? Restaurants are subject to inspections every 90 days. And then if you prove to be not safe, then you get a time to cure. And there's a time to cure here. And there's an appeals process. And ultimately, if you can't, if your restaurant is not in compliance, they shut you down. But they can still get wait staff even though they're subject to inspection. Your Honor, and certainly within the abortion facility context, there is oversight and there are inspections, and they're required by the regulations. However, with respect to the extension provision, what is required in that 90 days is an attempt to get transfer agreements. There is no need to extend the period of time to try to get transfer agreements because we know the answer. We know that no hospital in Louisville is going to sign a transfer agreement that meets the Cabinet's approval. So there's no need to continue this extension of period of time knowing that at some point the Inspector General is going to say, you have to have a transfer agreement. And if you don't, you'll need to close in 10 days. I see my time is up. A lot of cases are litigated in that 10-day posture. There's TROs, preliminary injunctions. I mean, that's usually what we require for parties to actually get to the end so we're not sort of speculating, which I think is what Judge Larson is concerned about. But can I just ask you back to the question I asked you earlier about, you know, a lot of this case seems to turn on the fact that this is thought to be the last operating clinic in the state. So I'm trying to probe that with you a little bit. Assuming there were four other clinics in the state, all of which had transfer agreements, this one clinic could not get one. Would your arguments be the same? Well, Your Honor, it would be a different argument. I know it's a different case. With respect to the burden, it would be different. With the benefit, it would be the same. There is no enhanced patient benefit in having these transfer agreements. And so I think going back to Judge Larson's questions, why would we be forced to jump through these hoops in 90-day increments for what? I'm just talking. So in that case, you're saying the burden is less on women in the state because there are other clinics? It may be. It depends on the capacity of the clinics. It depends on the different types of visitors. Reasonable capacity for the other clinics. Well, it also depends. Are we talking about are they all providing first and second trimester abortions? What's the distance of travel? In homeless health, for example, there were seven to eight clinics going to be left after the provisions of HB2 took effect, down from 40. And there was still an undue burden on women seeking access to abortion in Texas with those seven to eight remaining facilities because of the lack of capacity and the increased travel time. So it really just depends on the facts of the case. Suppose we're in the situation we're in and the clinic is not paying its state or local taxes and the state wants to shut the clinic down for not paying taxes. Would they be able to do that? Your Honor, that's entirely possible. I mean, we are not saying that there is any sort of. So the benefit of money to the state might be enough to outweigh any burden. Well, and Your Honor, that's not an abortion restriction. We're talking about restrictions on access to abortion, not some sort of. Well, it's a restriction that would apply to the clinic that would end up closing it. And you could say that the value, the benefit to the state. I mean, there are a whole host of reasons why the clinic could close. And I'm wondering, is there any, you know, is there the last clinic standing? Does that make it, you know, essentially impervious from any ability of the state? No, it doesn't, Your Honor. And certainly, if they were operating on safe conditions, that would be a different story. But defendants have conceded that no patient has suffered any sort of harm because of the lack of a transfer or transport agreement. I understand transfer agreement. I'm just trying to understand what else. Are there other reasons they could close the clinic? It's entirely possible, Your Honor. But it's impossible for me to sit here and say exactly what the case might be. But knowing the facts of this case with the district court's findings that are entitled to deference and the burden that is so great where you measure, according to Holman's Health, which instructs courts to measure the benefits against the burdens, there's no contest here. This would close the last clinic in the state. This would be tantamount to a ban on abortion with no corresponding medical benefit as the district court found it. The Lexington Clinic, there was a clinic in Lexington run by your client, right, for many years? Owned by Dr. Marshall. And it closed. Why did it close? It just closed a couple years ago, I think. So it was required to be licensed as an abortion facility. It was a doctor's office providing abortions. And the state specifically says that doctor's offices can provide abortions. And interestingly, doctor's offices do not have to have written transfer agreements, regardless of the type of procedure that they perform. When the state court decided that they needed to have an abortion facility license, EMW in Lexington started to apply for that license. And eventually, they gave up because every paperwork that they submitted, including their transfer agreement, was rejected. And as Dr. Marshall's unrebutted testimony is, it's one thing to get a transfer agreement, it's another thing to get one that's accepted by the cabinet. And eventually, he felt like it was fruitless and did not pursue it. There is a hospital in Lexington that is willing to enter into transfer agreements? The University of Kentucky entered into a transfer agreement. That case didn't go to litigation? They didn't stop short of that? It did not. I see my time is up. Yes, thank you. Thank you. May it please the court, Isha Anand for Appellee Planned Parenthood. Much of what we've been discussing today is resolved by Whole Woman's Health, by the standard of review, or by both. So I'd like to start with the notion that a 90-day extension of time provision can somehow salvage this unconstitutional statute. So to reiterate a couple of points that co-counsel made. First, as recently as the reply brief at 15, appellants have taken the position that it's a question of when, not if, they will stop granting these extensions of time. Because in the long run, per their expert's testimony, you need the transfer agreement. Second, the regulation itself doesn't just require consideration of alternative health measures and good faith, but also any other factor that the cabinet deems relevant. So that means that not only is there no sort of nitty-gritty evidence about Judge Larson, what you asked, what would count as an alternative measure, but any other factor can be taken into consideration. And third, the critical question here, the factual finding we're leaning on, is not about whether or not the cabinet will in fact grant one or even more than one 90-day waiver. The critical question is the factual finding that would be exceedingly difficult to operate if you only knew you were going to be around for another 90 days. And that's supported by unroboted testimony from Dr. Marshall on the record. But that testimony, it is true that he said that. But he said, I can't get staff if they knew they would only operate on a 90-day license, but without knowing how hard or how easy it would be to get the 90-day license. So we have to take his testimony as assuming that you couldn't, even if they were routinely granted, you just couldn't operate 90 days at a time. I just find that kind of incredible. I don't know why that would be true. If they are routinely granted, which we don't have facts showing that they are or are not, I just don't know why you can't operate 90 days at a time. And you have to show it, right? Certainly, Your Honor. It's certainly our burden. We know that they're at least not indefinite, right? That's the position that Dr. Hamilton took, that alternative measures would suffice in the short run, but not the long run. And again, in the reply brief at 15, the cabinet has reiterated that. Also, Your Honor, Dr. Marshall's testimony was unroboted. No one else put any evidence in it. And so to say that it was clearly erroneous to rely on that testimony would be contrary to the standard of review. And I'll just note that Holman's held. It's totally unsupported speculative testimony. He's just saying, well, I couldn't possibly, because nobody would work here. Knowing that there's a point at which their job is going to end and not knowing whether that's 90 days from now or 180 days from now, because we know these are not indefinite extensions. Right, but like if you had a loan provision that you were operating at, at some point you might lose your financing. That could be true for any business. It just seems very speculative to me. So maybe I can draw an analogy. Maybe you can help me. Sure. Maybe I can draw an analogy to Holman's health that would be useful. So in dissent, Justice Alito said, you know, it may be the case that actually all of these remaining facilities can make up a deficit in capacity. That's a 2347. They can hire more medical staff. And the majority said there was not even testimony in the record from those facilities saying we can't hire more staff. So they didn't even have the testimony that we have here. And the majority said that's not how we do this analysis. We don't have to prove 1000% definitively that these clinics won't be able to avoid passing along the burden to women. It's enough that that's the most likely outcome. And there the majority relied solely on quote common sense, not on any testimony in the record. And so to say that here where we have significantly more evidence than we had there, we have Dr. Marshall's testimony, we have the fact that these are going to. So wait, so you concede it's your burden to prove that they will shut down. But that is the most likely outcome. Yeah, Planned Parenthood will shut, I'm sorry, EMW will shut down. And I guess Planned Parenthood won't be able to enter the market. Although your testimony was, well, we wouldn't have been able to build this facility that we've already opened, so I don't know how that helps Planned Parenthood. But in any event, let's focus on EMW. Your burden is to show not with evidence that they would shut down, but per Whole Woman's Health that with common sense not supported by evidence they would shut down. That's what. Just in Whole Woman's Health there was not even testimony saying we can't hire additional doctors. And yet the majority said that's not necessary because the burden of proof is not so high that you have to prove with 100% certainty. And here I think on Planned Parenthood side of the ledger, we, for example, at the moment don't have an MD on staff who is providing abortions. We will hire that person if we are able to get a permanent license. But it's impossible to make a job offer to a highly skilled professional if all you can guarantee them. Well, that kind of makes sense to me. But then I feel like I'd need some evidence in the record that tells me something about the job market for physicians or the job market for nurses or the job market for, I have, I feel like I'm guessing. And again, in Whole Woman's Health there was none of the sort of evidence that you're describing and there was not even testimony on the question of whether the existing clinics could hire more medical staff. And yet the Supreme Court said that's not necessary. Here we have unrebutted testimony and we're reviewing for clear error. I'd also just like to note, as my co-counsel pointed out, that this is a very different situation than some of the analogies that the state has drawn in their briefs. So, for example, in Hawley you had a permanent waiver provision, not just an extension of time provision that had to be renewed every 90 days. And so the idea that a facility can operate, the idea that a facility should apply for that permanent waiver provision makes a lot of sense. If you get it, you can operate indefinitely. If you don't, then you can come to court. Here, even if we get the 90-day provision, the point is that it would be very, very difficult to operate in those sorts of increments. If I could turn to the question of the other facilities remaining in the state. Your Honor, again, this is an argument that was considered and rejected by Whole Woman's Health. So again, in dissent, Justice Alito noted not only that there may be new clinics that open or new facilities that could pick up the slack in terms of providing abortions, but in fact in the two years since the record had been made, there had been new clinics that had opened, 50% more clinics had opened. And again, the majority rejected that and said that's not the question we ask. We take the record as it stands at the time of the district court, who's providing abortions then and how many of them will remain. In particular, as we explained at 61 and 62 of our briefs regarding this facility in Lexington, just having a facility in Lexington doesn't mean it's a facility where we can provide abortions. So for instance, we've had a facility in Louisville since 1933. And yet when we wanted to change course and provide abortions at that facility, we had to raise $4 million, we had to find a new building, we had to spend months searching for a place where we could apply with zoning regulations. And there's some additional challenges in Lexington that Kim Green and Lynn Bunch testified to. Namely, the idea that it's harder to manage a team that's further flung from the Indiana border and the challenges of raising funding in Lexington. The Indiana border seems to kind of cut both ways because there are clinics across the border, so. Certainly, I just meant that there are. Like more of a central location, especially for probably some women who are more financially challenged. Certainly, your honor. But again, the idea is that we can snap our fingers and suddenly say, we rent space in Lexington and therefore we can begin providing abortions. And so again, we've got some. Facility there in 2016 that was running, and it sounds like they didn't go all the way through the licensure process or bring litigation there to keep that. So that was an EMW facility, not a Planned Parenthood facility. No, I understand. I'm sort of treating you collectively. Certainly, I understand, your honor. So two points to just be aware of on that front. One is, again, just as the University of Kentucky had given us a transfer agreement, the University of Louisville had also given us a transfer agreement, and it was revoked very shortly after it was given. And so the idea that we would raise this sum of money in Lexington based on this transfer agreement that could be just as easily revoked is a very difficult sell for funders and the like. I have one question about the record with respect to emergencies or whether there's a true health concern here that this law and regulation is trying to get at. There was testimony from Chief Hamilton. Do you know who I'm referring to? Doug Hamilton, the Emergency Medical Services 9-1-1 provider? Correct. And so he, it's a he, right? Yes. He said that his emergency medical service had responded to 61 calls at EMW over 24 months. That's correct, your honor, but only- That doesn't sound like, you know, there could be, certainly could be a higher number. It's not a, it's not a de minimis number, I wouldn't say. So I believe the testimony is that only three of those were for patients in the facility. So the rest were people who were outside the facility. And of those, only two required a hospital transfer. And Doug Hamilton, remember, is the one who sort of said, these agreements are, quote, the silliest things I've ever seen because no one actually looks at these agreements when they're making decisions about how to transport or treat a patient. I guess the fact that so many states have them, to me, kind of cuts the other way on that point, but. So can I, if I, I see my time is up, can I answer Judge Redler's question? If Judge Redler would like your answer. Of course, yeah. So I just want to make three quick points about those regulations in other states. So the first one is the one my co-counsel made, which is that a lot of these predate EMTALA, the statute requiring hospitals to care for any patient that shows up. So again, that's why the federal government is considering repealing their transfer agreement requirement because it doesn't serve any purpose. EMTALA has, quote, rendered such transfer agreements unnecessary. So a lot of those are artifacts from before hospitals were required to accept patients. The United States hasn't repealed it yet, right? No, that's correct, but they're in the process of doing so. And I think that's indicative of why a lot of these provisions came into place. Before EMTALA, you really needed them, hospitals didn't have to accept anyone. The second is that some of these regulations are ones that Planned Parenthood could easily comply with. So, for example, California just requires a, quote, detailed procedural plan, and, quote, no reasonable plan shall be disapproved. So there's a clear alternative. You can't get the agreement. You just need a detailed plan, which Planned Parenthood has. Is that a provision there, or do they? No, that's a permanent provision. So once you've got a reasonable plan, you get your license, and you don't need a transfer agreement ever. And the third is, you know, again, as Your Honor noted, in Columns Health Holds, you can't regulate abortion facilities like ASCs. And many of the regulations cited by AMICI are regulations of ASCs. I'll also just note that, as Pro Counsel mentioned, even in states that have these provisions, it depends on the burden on the ground, and evaluating whether those provisions would constitute a non-due burden. All right, your red light's been on for a while, so thank you for your argument, and have a rebuttal. Your Honors, I'd like to start where I left off. You did not hear opposing counsel explain why the National Abortion Federation would recommend transfer agreements if they don't benefit patients. You did not hear them explain why it is somehow magically an undue burden to cross a state line. And you didn't hear them suggest what Kentucky could do if it can't do this. What you heard a lot about is that somehow the Commonwealth of Kentucky is going to be arbitrary in its application of this regulation. And that's just not the case, Your Honor. That's wrong for at least three reasons. Number one, the law says that you have to presume good faith on the part of a Commonwealth, or on the part of a state. Number two, we have an Administrative Procedures Act in Kentucky. There will be lots of due process involved in this. When you get that 10-day letter, it's not just that your license magically disappears at the end of 10 days. You have 10 days, and then you have an appellate process after that, and then it goes to the Cabinet Secretary, and then you can appeal to the Kentucky judicial system. There is a significant amount of due process. It doesn't just disappear. And we've also got a constitutional... When the due process is utilized, the thing that the adjudicators will be looking at is that whether to continue this 90-day extension or to cancel it is purely discretionary. So, as long as it's a matter of discretion, nothing is guaranteed in terms of the continuation of these 90-day extensions. You would agree with that, I take it? Well, not entirely, Your Honor. I don't agree with the premise. I don't agree that it's entirely discretionary, because it's not discretionary in the sense that you can be arbitrary. The Commonwealth cannot... I didn't say arbitrary. I said it's purely discretionary, and that was found and noted by the district court, was it not? Well, it's discretionary in the sense that the Commonwealth gets to make a decision, and it's not an automatic or rote decision. They have to demonstrate sufficient alternative safety measures every 90 days to keep their license. But to Judge Larson's point from earlier, why not let them go through this process and try? They haven't even tried. There's no record. Do you have a sense of what you're going to count as an alternative safety measure? Or what would count as good faith efforts to obtain a transfer agreement? I mean, is that just like send a letter saying, could I please have one, and then they say no, and then you say, okay, I tried? Or is it... What is it? Well, there are two answers to that, Judge Larson. The first is we don't know exactly, because nobody's tried. We don't have a record on that point. But the other answer, I think, is we can look at Dr. Richard Hamilton's testimony and see what would be an alternative safety measure. Dr. Hamilton explained that really in the short run, if you have working relationships with sending and receiving facilities, you can have adequate safety in the short run, as long as the personnel are aware of each other and know what's going on, know the transfer protocols. But the gold standard is a transfer agreement. Does working relationship mean like admitting privileges? I'm sorry. No, Your Honor. Just a familiarity, a professional relationship where the personnel are familiar with each other, familiar with the facilities. And there's no reason and no evidence in the record that couldn't happen here. Your Honor, this is about women's safety. Just on that last point, the state of Kentucky has set up no standards or regulations for the exercise of the discretion that would be exercised, as I understand. We don't have any guidelines that have to be conformed to as far as we know. Is that right? Well, it's not completely arbitrary. I didn't say arbitrary. I said there were no standards that had been promulgated for exercise of discretion. That's all I'm asking about. I'm not asking you whether it would be arbitrary or not. I'm asking whether there were any standards promulgated for exercise of this discretion. The standard is that they have to demonstrate sufficient alternative safety measures. And if they were to be denied on that ground, there would be an administrative process. And evidence introduced in the administrative process to see whether they're sufficient or not. Your Honor, this is about women's health. This is about making sure that women are safe in the event of an emergency. Every other outpatient surgical center in Kentucky is required to have this. Women deserve the same protection in the commonwealth. Your question on the point about clinics being available outside of Kentucky, Indiana, Ohio, what's the best case you think that says that we can consider clinics that aren't in Kentucky? Well, the Cole case from the Fifth Circuit, which was reversed as Hellerstedt, held that you could rely on New Mexico clinics. Hellerstedt did not address that point. Judge Garza on the Fifth Circuit has agreed with that as well. Judge Mannion on the Seventh Circuit. So there's not an abundance of case law on this other than Cole supporting our position. But if we're serious about the undue burden standard, measuring practical impact on access to abortion, we've got to take that into account here. And another reason we have to take that into account here is the large fraction test, which the district court didn't apply. What's interesting is EMW formulates the large fraction test, formulates the denominator as the number of women seeking abortions in Kentucky. Well, that necessarily includes interstate travel. Because we know from the evidence in the record, a lot of women who seek abortions in Kentucky are from other states. So if you're going to include women from other states coming to Kentucky in the large fraction test, you can't exclude interstate travel from other parts of the undue burden analysis. You can't pick and choose. We're either going to include interstate travel or we're going to exclude it. And even under Planned Parenthood's formulation, you have to take into account interstate travel. It makes no sense to, if we're serious about measuring practical impact, we have to actually look at practical impact. And, Your Honors, I see my time is up. I respectfully request the district court be reversed. Thank you, Your Honors. Thank you very much. The case is submitted.